# STURMBERG v. TRAVELERS PROTECTIVE ASS'N OF AMERICA.
## No. 7762.

Circuit Court of Appeals, Fifth Circuit.
Dec. 28, 1935.

Rehearing Denied Jan. 20, 1936.

998

John P. Pfeiffer, of San Antonio, Tex., for appellant.

Martin J. Arnold and Perry S. Robertson, both of San Antonio, Tex., for appellee.

Before FOSTER and SIBLEY, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

Plaintiff sued in the state court of Texas, on a policy of accident insurance, claiming injuries which caused total disability, entitling him to recover the stipulated sum of $50 per week for 104 weeks, statutory penalties, and attorney's fees under the law of the state. The case was removed to the court below on the ground of diverse citizenship. After the evidence was all in, the court, on motion of the defendant, directed a verdict in its favor. It, therefore, becomes our duty to examine the record to see if there was substantial evidence from which a reasonable mind might have concluded the plaintiff received injuries in the manner alleged, and which, under the terms of the policy and the law applicable thereto, would have entitled him to a verdict.

The pertinent allegations of the petition are as follows:

"That on the 8th day of April, A. D., 1932, this plaintiff, while on the highway some ten or twelve miles out of Floresville, Wilson County, Texas, found it necessary to change the right rear casing on the light coupe automobile in which he was riding. After jacking up the rear axle and removing the deflated casing and removing the spare from the rack, the jack holding up said axle fell over and the car went down, resting on the right rear wheel without a casing. In rejacking up the car and while trying to place a piece of plank on top of the blocking up in order to raise said rear axle higher to permit the placing on the wheel the inflated casing, some part of the said automobile came in violent contact with plaintiff's neck at or about the base of the skull. Said contact caused immediate vomiting and violent cold perspiration on the part of the plaintiff for about thirty minutes.

"Said violence caused by said automobile hitting this plaintiff, as aforesaid, this plaintiff within a few days thereafter began to suffer from traumatic arthritis or traumatic rheumatism of the spine. That the trauma caused by said violence, as above set out, has involved the central nervous system of this plaintiff to such an extent that he has partial paralysis of the right arm and has lost the muscular control of various parts of his body and especially his right arm and left leg, and has produced neurosis accompanied by cold sweating, nervousness and mental incoordination to the extent that he is physically and mentally disabled to such an extent that he is entirely incapacitated and unable to perform any part, or substantial part, of his usual or regular business."

We also quote the relevant provisions of the constitution of the defendant association:

"Sec. 5. Whenever a Class A member of this Association in good standing shall through external, violent and accidental means receive bodily injuries which shall independently of all other causes immediately, continuously and wholly disable him from transacting any and every kind of business pertaining to his occupation as shown by the records of this Association, he shall, upon compliance with and subject to the other provisions, conditions and limitations of this Constitution, be paid for the loss of time occasioned thereby the sum of $25.00 per week, not exceeding one hundred and four consecutive weeks. * * *

"The foregoing provisions of this section shall apply to Class C members, save that Class C members, shall receive double the amount of benefits for Class A members." Art. 10, § 5.

"This Association shall not be liable to a member or his beneficiary for any disa-

bility benefits, special loss, or death benefits, when the disability, special loss, or death of a member occurs under any of the following conditions or circumstances; when inflicted by a member on himself while sane or insane; when there are no visible marks of injury upon the body (the body itself not being deemed such a mark in case of death.); * * * when caused wholly or in part by any bodily or mental infirmity or disease, * * * when the result of voluntary over-exertion (unless in a humane effort to save human life) * * *; when resulting wholly or in part from * * * paralysis, apoplexy, * * * cerebral, menigeal or spinal hemorrhage, * * * or any other disease or diseases." Art. 12, § 1.

Plaintiff, as a witness in his own behalf, testified in substance as follows:

He was sixty-four years old when the alleged accident happened and at the time was and had been for more than fifteen years a member in good standing of the defendant association; that he belonged to class C of certificate holders, who in case of total disability, as defined by the constitution and by-laws, was entitled to receive $50 per week for 104 weeks; that he had not worked since the day of his injuries on April 8, 1932; that on the latter date he was traveling on a sandy dirt road, in a Chevrolet Standard coupé, when the right rear wheel went flat; that he set his brakes, jacked the axle up, removed the deflated tire, and went to the rear to remove the spare for replacing on the car; that a slight jerk was required to remove the spare from its rack, which caused the axle to slip off the jack and the hub of the wheel then rested in the sand; that being unable to get the jack under it again, he "got some blocks and laid them close to the axle as a fulcrum and I used a piece of wood, seven or eight feet in length as a lever to raise the car. I tied the wheel that I had taken off to the end of the lever to assist in the raising of the car. As the car would raise I would push pieces of wood between the axle and blocking. In placing these pieces of wood I would put my left leg under the car and stoop down, and as I was about to place a piece I either lost my balance or the car slipped, something happened, and I had the sensation that I bumped my head and fell flat on the ground. My recollection, which did not come back to me until the following December, is that I received a bump back of my neck when my pry slipped and the car came down."

That after falling on the ground he became sick and started to vomit, sat on the running board with perspiration rolling off of him and drank most of a thermos jug of water; that this consumed about twenty or thirty minutes; that after feeling better, he did not try to jack the car up any further, but dug the sand out from under the wheel and slipped it on; that he was still dizzy and the "sun seemed to be in the North"; that he went on through Pleasanton and Jourdanton, home, but does not remember when he arrived there. The next day he got his mail at the post office, "but was still confused and got all mixed up and had entirely forgotten something had happened to me"; that his arm hurt him and he went to see a chiropractor and on the 15th and 16th of April went to see a doctor, who made an examination but did not treat him and who wanted to extract some spinal fluid; that he was examined and treated on May 5th, by Dr. Hanson, who continued to do so, three times a week for six or seven weeks; that at the request of his employer, the Gulf Refining Company, he was examined by Dr. Dorbrandt on August 6th and 7th, who did not treat him; that when he first went to the doctors he did not remember anything with reference to the accident, but after a "hard adjustment in my neck by a chiropractor * * * about the beginning of May" he remembered sitting on the running board and vomiting, but did not have a clear recollection of what happened until December, 1932; that he then recalled that he "had a sore spot in the back of my neck, and I recollected that I received it when the car came down, when my pry slipped. * * * My recollection is as it first served me in December, 1932, of what occurred in April before, is that I thought I hit my head against the car real hard, the side of my head and neck, and the pain in the back of my head or neck continued until July, 1934. I have no idea what actually happened there or how I was injured. My recollection is very confused, vague, when you are just knocked out right now, that is all I know."

On cross-examination plaintiff reiterated a good deal of his testimony. After testifying as above indicated, he then identified a claim for compensation filed with the Industrial Accident Board, under the State Employers' Liability Act (Vernon's

Ann.Civ.St.Tex. art. 8306 et seq.), the date of which is not shown, but which was offered in evidence by the defendant, and in which he says: "The cause of my injury was blocking up an automobile under which the jack had fallen down when I was changing tires. The axle was on the ground and no help in sight, nor 'phone. This was in the sandy black-jack country. It was very hard work for me to do without help. Was on my knee, stretching to put piece of board with one hand and prying with the other. And then there was a snap in my head, and I got sick. The nature of my injury is as follows: I suffered sprain in back of my head and in the middle of my back, both on the right side. Sharp pain in my head caused me to vomit, was sick for half an hour with cold perspiration."

In the "Claimant's Preliminary Statement" to the defendant, signed on May 16, 1932, he answered questions with reference to the accident as follows:

"(a). When did it happen?

"At 2 o'clock p. m., on the 8th day of April, 1932.

"(b). Where did it happen?

"On country road between Floresville and Jourdanton, Texas.

"(c). How did it happen?

"Trying to pry up car, from under which jack had fallen down. Was changing tire.

"(d). What were you doing at the time?

"Changing tire.

"(e). What bodily injuries were received?

"Severe pain in head and neck."

Plaintiff was attended by Dr. W. S. Hanson on May 5, 1932, who made a report to the defendant in which he stated: "The precise nature of the injury and its extent was probably hemorrhage at base of brain, due to rupture of vessel incident to undue physical exertion. Found no indication of disease, and was unable to say how long patient would be unable to engage in gainful occupation. Now he has paresis (partial paralysis of r. arm and left leg.)"

When called as a witness, Dr. Hanson testified he had known plaintiff for seven or eight years and when he examined the latter and made the report to the defendant on May 5, 1932, plaintiff showed partial paralysis of right arm and a considerable degree of mental confusion; that his heart action, blood pressure, etc., were normal. "My analysis of the case at that time was based upon what history I could obtain from Mr. Sturmberg plus the result of my physical examination and observation. I examined him again in December, 1932, and my conclusions from that examination are different from those reached from the May examination. The original conclusion was based on the patient's history of how his condition came about. He could give me no coherent nor exact statement as to what he thought had happened to him previously that caused the present condition. In December his memory had improved to such an extent that he could give me in detail all of the things which had happened to him in April, 1932. My conclusion at the May examination was that his injury was due to a hemorrhage of the brain, due to rupture of vessels, incident to undue physical exercise. My conclusion after the December, 1932, examination is that it was not due to excessive physical exercise but was due to a blow which he had received on the back of the skull and underpart of neck. My opinion is that his memory came back to such an extent that the recital in December as to how the injury occurred is a correct one. A blow on the head would be liable and would probably cause a complete effacement of the memory of a particular occurrence at that time but his memory would revive at a later date. It is my opinion he had a hemorrhage and a concussion of the brain. Concussion of the brain frequently disturbs the memory of a particular occurrence at that time but his memory would revive at a later date. It is my opinion he had a hemorrhage and a concussion of the brain. Concussion of the brain frequently disturbs the memory of a patient of the accident and in many cases it does not return for weeks and months." He examined the patient on January 14, 1935, and found there had been a gradual and steady improvement of the mind and was otherwise in good condition for a man of his age. "Outside of the head injury and the paralysis * * * his condition in 1932 was good, as there was no evidence of any impairment of any other part of the body and his mental condition now is just about the same as in 1929." (The doctor testified that he had examined the plaintiff in 1929.)

This witness further testified that if the bursting of a blood vessel at the base of the

brain had been due to disease, such as arteriosclerosis, he would not have recovered in the manner he did, but his condition would have grown worse, whereas if the trouble was caused from a blow, his improvement would have been in accordance with what actually happened.

Of course, in so far as what actually happened, the doctor's opinion rests entirely upon the hear-say statements of the plaintiff, forming part of the history of the case, which would be necessary in making a diagnosis, and giving an opinion, but it cannot be received as proof of the facts themselves taking place at the time of the injury.

 The foregoing reference at length to the testimony of plaintiff has been made largely because he was the only witness to the immediate circumstances surrounding his injury, and to illustrate the inconsistency of his actions and of his statements about the most important facts bearing upon the issue of whether he received an external blow on the back of the head. It leaves the matter in great confusion and does not amount to substantial proof sufficient to go to the jury that he received a blow upon the head.

There are two main difficulties confronting the appellant in this case: First, the policy is a very restricted one, in that the injury must have been due to "external violent means * * * which shall, independently of all other causes, immediately, continuously and wholly disable him from transacting any kind of business pertaining to his occupation * * *," and the defendant "shall not be liable * * * when the disability * * * occurs" and "there are no visible marks of injury upon the body (the body itself not being deemed such a mark in case of death)" or "when the result of voluntary over-exertion. * * *" Second, plaintiff was the only witness to what happened at the time of his alleged injury and he does not say that he was actually struck by the car, but that "as I was about to place a piece (of wood), I either lost my balance or the car slipped, something happened, and I had the sensation that I bumped my head and fell flat on the ground. My recollection, which did not come back to me until the following December, is that I received a bump back of

my neck when my pry slipped and the car came down."

On cross-examination, he stated also, "I told my attorney on direct examination that while I was working with the car I did not know exactly how the occurrence happened, but I was satisfied that I either lost my balance or the pry slipped, or both. I felt a sensation of pain in my head or neck like bumping my head, as though I had bumped it. * * * I had gotten the car nearly jacked up when I felt the sensation in my head. The pain came in the effort when I was putting this piece of wood in the opening. At the time I felt the pain I hadn't gotten the car as high as I wanted it. When I felt the pain in my head I fell flat when I was struck; fell with my face in the sand." Leaving out of consideration the statement made to Dr. Hanson and in his report to the defendant company, as well as in his application for compensation to the state board, all of which say nothing about a blow from the car, this evidence of the plaintiff himself leaves largely to the imagination or conjecture whether the rupturing of the blood vessel was due to a blow or was caused by the excessive exertion of attempting to jack the car up, and as to which the certificate of insurance expressly declares there shall be no liability. Then too, the evidence nowhere discloses that there were any "visible marks of injury upon the body" of the plaintiff, unless as counsel contends, the vomiting, dizziness, and loss of memory can be said to fall within that category. However, these could have followed hemorrhage produced by excessive exertion as well as by a blow. The matter cannot be left to conjecture. In order to recover, plaintiff must prove facts which reasonably tend to establish by a fair preponderance that a blow was inflicted in the manner alleged and not leave the case in a condition where the facts are equally consistent with the conclusion that the injury resulted from causes excluded from the insurance certificate, to wit, overexertion. Corinne M. Anderson v. Travelers' Protective Association (C.C.A.) 74 F.(2d) 170, and authorities cited therein.

Our conclusion is that the judgment should be affirmed.

Affirmed.